NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

06-1289

STATE IN THE INTEREST OF S.N.F.

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-2004-0739
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

GLENN B. GREMILLION
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Glenn B. Gremillion, and Billy Howard Ezell, Judges.

**AFFIRMED.**

Lloyd Dangerfield
703 E. University Ave.
Lafayette, LA 70503
(337) 232-7041
Counsel for Defendant/Appellee:
    C. S. F.

Debra K. Basile
825 Kaliste Saloom Road
Brandywine I, Suite 218
Lafayette, LA 70508
(337) 262-5955
Counsel for Plaintiff/Appellee:
    State of LA., Department of Social Services

**Vivian Neumann**
**P. O. Box 2220**
**Lafayette, LA 70501**
**(337) 237-1113**
**Counsel for Plaintiff/Appellee:**
    **S. F.**

**John A. Hernandez, III**
**321 W. Main, Suite 2-G**
**Lafayette, LA 70501**
**(337) 233-5330**
**Counsel for Defendant/Appellant:**
    **J. L. F.**

**Jael Dugas**
**825 Kaliste Saloom Road**
**Brandywine II, Room 104**
**Lafayette, LA 70508**
**(337) 111-1111**
**Counsel for Plaintiff/Appellee:**
    **State of LA., Office of Community Services**

**Kristi Lumpkin**
**Casa of Acadiana**
**1319 W. Pinhook Rd., Suite 330**
**Lafayette, LA 70508**
**Counsel for Plaintiff/Appellee:**
    **Casa of Acadiana Association**

GREMILLION, Judge.

In this case, the father of S.N.F., J.F., appeals the trial court's judgment terminating his rights to the child. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

S.N.F. was born August 28, 2004, while her mother, C.F., was incarcerated. In early September 2004, S.N.F. entered the State's custody and was adjudicated a child in need of care in mid-October 2004, due to her mother's incarceration and her father's unpreparedness to take care of her. Both C.F. and J.F. have an extensive history with the Department of Social Services and J.F.'s parental rights to three of his other children have already been terminated. The record reveals extensive and detailed case plans. On February 13, 2006, the State filed a Petition for Termination of Parental Rights and Certification for Adoption. Following a hearing in May 2006, the trial court rendered a judgment terminating J.F.'s parental rights to S.N.F. J.F. now appeals.

**ISSUES**

J.F. assigns as error:

1. The trial court's failure to find that he substantially complied with the case plan,

2. The trial court's allowing a prior judgment terminating his parental rights to other children into evidence, and

3. The trial court's failure to find that there was no reasonable expectation of significant improvement in his condition or conduct.

**DISCUSSION**

We have stated that "[p]arental rights to the care, custody, and

1

management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156; *see also Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate his rights. *Lassiter v. Dep't of Social Servs. Of Durham County,* 452 U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.,* 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repetitively held that the interests of the child are paramount over that of the parent. *In re J.A.,* 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parents rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id.* at 811 (citation omitted).

The trial court's determination regarding the termination of parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong. *In re V.F.R.,* 01-1041 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, *writ denied,* 02-0797 (La. 4/12/02), 813 So.2d 412.

Jael Dugas, a case worker for the Department of Social Services, testified that S.N.F. was brought into the State's custody on September 2, 2004, and adjudicated a child in need of care on October 19, 2004. Dugas testified that she was the case worker in a prior matter in which J.F.'s rights to three of his other children were terminated. She stated that she has been working with J.F. and his family since September 2002. Dugas testified that J.F. has housing problems, did not follow through with recommendations made following psychological evaluations, failed to consistently visit and bond with S.N.F., and failed to consistently pay child support.

Dugas explained that S.N.F.'s mother, C.F., was incarcerated at the time she was pregnant with S.N.F. C.F. provided J.F.'s name as the person who would be S.N.F.'s caretaker after her birth. Dugas stated that DSS then went out to investigate if placement in J.F.'s home would be appropriate and found that there was no electricity in the home and that no provisions were made for caring for the child. Accordingly, at her birth, S.N.F. was placed with a relative for approximately two to three months. In December 2005, C.F. was released from prison and entered a treatment facility. S.N.F. was then able to reside with her mother at the treatment facility. C.F. worked the program at the treatment center and attended meetings for eight-and-a-half months. However, when she left, she did not have a job or any arrangements to take care of S.N.F. C.F. gave S.N.F. to someone else to take care of

3

her for a week after she left the treatment center. Dugas testified that the agency did not feel this was a safe environment and removed S.N.F. from C.F.'s care at that time.

Dugas testified that S.N.F. was not placed with J.F. because he was not complying with the agency and had only visited S.N.F. on one occasion during the eight months she had resided with C.F. at the treatment facility. She further stated that J.F. denied paternity at that time. Additionally, in late January 2005, J.F. executed a document surrendering his parental rights to S.N.F.[1] However, Dugas testified that the agency did not accept his surrender at that time.

Regarding the case plan, Dugas testified that J.F. was to provide safe, clean, and stable housing for himself and his child, but that he did not meet that requirement. The next component of the case plan was that J.F. address his psychological issues, however, Dugas stated J.F. did not follow through with the recommendations of several psychologists. J.F. was diagnosed as having paraphilia tendencies and he was asked to participate in a group for those who are sexual perpetrators or sexually addicted because the agency felt that he put sexual relationships ahead of the welfare of his children. Dugas stated that he did not follow

---

[1]The letter was addressed to Dugas and stated (all errors are in the original):
I'm writing to let you know that I am going to give up my parental right to S.N.F.
Reasons at this time I'm considering this is, my feelings at this time are for the lack of cooperation with you and your organation.
At the last home visit which is also the last I have been able to speak to you personally or by phone. At that time, you told me that arrangements were already made for you to meet with [C.F.] It was at this time in our conversation that you said I be allowed to see [S.N.F.] In fact, you even offered to give me a ride from the laf. Office to and from. This was to accure on a date before December 24,2004. I was to call to get the exact time and date.
I tried calling several times. I called Monday, December 20, 2004. I called again Tuesday, December 21, 2004. As of today Monday, January 31, 2005 I haven't heard from you yet. It seems to me that I'm being discriminated against. Because I'm male and my age, and also the type of work I do.
It seems like rules and regulations need to be brought to the legisiglations attention at the next session to investigate the allegations if any are being discriminated against.

through with that recommendation, although he did attend some Al-anon meetings. Next, J.F. was to visit S.N.F., but, as previously mentioned he only visited her once during the time C.F. was in treatment and had not visited in the two-and-a-half months prior to trial. J.F. was also court-ordered to pay child support, which he paid two times. Dugas was of the opinion that J.F. had not significantly complied with the case plan. She further testified that it was in the best interests of S.N.F. that J.F.'s parental rights be terminated.

Dugas stated that S.N.F. has been in an adoptive home since October 10, 2005, and that she is thriving in the home and bonded to the foster mom. She stated that S.N.F. had adjusted very well.

The report of Dr. Alfred Buxton, a clinical psychologist, was submitted into evidence. Dr. Buxton administered several tests to J.F., but his results were invalid due to J.F.'s "fake good" responses in which he attempted to present himself as being free of any faults or problems. Dr. Buxton's report stated that this would be of great concern in attempting to understand J.F. Dr. Buxton concluded that it would not be in the best interests of the child to be placed in his care, and he recommended that J.F. seek counseling.

J.F. testified that he has been a self-employed wrecker operator for twenty-five years. He stated that initially C.F. told him that she wanted the baby placed with a relative and that he accepted that, but that the day after S.N.F. was born, C.F. called him and told him that she wanted the baby to be placed in his care. J.F. stated that he was surprised and unprepared at that time because he had not made any arrangements. However, he testified that the same afternoon, he bought a second trailer and was getting everything prepared when Dugas arrived for an inspection. J.F. stated that the electricity and all amenities would have been set up by the next

5

day in order to care for S.N.F. J.F. testified that he brought pictures of the trailer in to the agency two days later.

J.F. testified that he visited S.N.F. at the treatment center one time. He said that the second time he attempted to visit, C.F. had left for the weekend on a pass. He said that the following week, he was advised by Dugas that he was not to have any contact with her whatsoever.

J.F. further testified that he paid $250 for the examination with Dr. Buxton, but that he was never given a copy of the report, despite his requests. J.F. implied that Dugas had been difficult to deal with and had gone out of her way to cause him problems. He testified that he has attended Al-anon for the past year, at least once a week. J.F. further testified that he has visited with S.N.F. "way more than two times" since July 2004. However, he stated that the visits did not go well because Dugas interfered and S.N.F. would cry. J.F. admitted that he has not fulfilled all components of the case plan because of discouragement by Dugas and lack of cooperation with the agency. He was of the opinion that his actions would not make any difference because Dugas and the agency had already made up their mind. He further testified that he inquired as to programs the agency offers that are available to reunite mother and baby and felt that because of his age and sex, he was discriminated against. In conclusion, J.F. recommended to the court that C.M., a family relative, be able to adopt S.N.F. because that would allow her to be able to visit his other children.

At the conclusion of the hearing the trial court stated:

> With regards to the father, the Court also finds that he has failed to work his case plan, provide for adequate housing, failed to follow up on the psychological evaluation and recommendations. And furthermore, the Court finds whether it was because of whatever reasons, he has failed to visit and follow through with visits with the child and has not complied with other components of the case plan. I

6

understand [J.F.'s] reason for that or his concern that he felt like no matter what he did it wouldn't be the right thing. But the fact of the matter is, he had been involved with the State before, he had three children that were terminated – two or three that were terminated previously, and I think that clearly he knew that unless he worked his case plan, that termination would be the ultimate result of that. And because of the failure to work the case plan, the Court would terminate his parental rights at this time as well.

The State's petition to terminate was based on the grounds contained in La.Ch. Code art. 1015(4) and (5). Article 1015 sets forth the grounds for the termination of parental rights:

> (4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . . .
>
> > (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
> >
> > (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
>
> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

The State's petition lists as the reasons for termination pursuant to Article 1015(4):

> a. As of the filing of this petition, said parents have failed to provide significant contributions to the minor child's care and support for a period fo six consecutive months; and,
>
> b. As of the filing of the petition, the father has failed to maintain significant contact with the child by not visiting or communicating with her for a period of six consecutive months.

Pursuant to Article 1015(5), the State's petition lists the following reasons as grounds for termination:[2]

> a. The parents have failed to cooperate in the case plan established for reunification of the family;
>
> b. The parents have failed to regularly exercise court approved visitations with their minor child;
>
> c. The parents have failed to contribute to the costs of the child's foster care as ordered by the court when approving the case plan;
>
> d. The parents have repeatedly failed to comply with the required program of treatment and rehabilitation services provided in the case plan;
>
> e. The parents have shown a lack of substantial improvement in redressing the problems which have prevented reunification;
>
> f. The conditions that led to removal, or similar potentially harmful conditions, continue to persist;
>
> g. The parents' conduct reasonably indicates that they are unable or unwilling to provide an adequate permanent home for their minor child, based upon an established pattern of behavior.

## SUBSTANTIAL COMPLIANCE

---

[2] Louisiana Children's Code Article 1036(C) provides that:

[L]ack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parents failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

J.F. argues that he substantially complied with his case plan in that he was employed, provided adequate housing, and attended Al-anon meetings. However, J.F. readily admits that he "did not complete all components of his caseplan" including visitation and support payments. J.F. attributes the lack of visitation to the fact that he was discouraged with the agency and the "negative atmosphere" that existed when he did visit. As the trial court and the State pointed out, this is not J.F.'s "first rodeo." Regardless of the nature of the atmosphere and whether or not he was discouraged, J.F. should know by now that substantial compliance with the case plan is required, which includes visitation. Secondly, J.F. admits that he did not make support payments and "offers no excuses" as to why except that he was dissatisfied with how Dugas was handling the case. Again, this is insufficient reasoning to relieve a parent of his duty to substantially comply with the case plan in order that he may be reunified with his child. Accordingly, we find the trial court did not err in finding that the State proved by clear and convincing evidence that J.F. did not substantially comply with his case plan in that he failed to visit or make child support payments. This assignment of error is without merit.

**PRIOR TERMINATIONS**

Louisiana Children's Code Article 1015(3)(k) includes as a ground for termination of parental rights:

> Misconduct of the parent toward this child or any other child of the parent of any other child in this household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
>
> . . . .
>
> (k) The parent's parental rights to one or more of the child's siblings have been terminated due to neglect or abuse and prior attempts to rehabilitate the parent have been unsuccessful.

9

J.F. briefly attempts to argue that it was error for the trial court to accept into evidence a Judgment of a Prior Termination because it bears no relevance to the case at hand. On the contrary, the Children's Code specifically allows for termination where a parent has had previous terminations of their rights and prior attempts to rehabilitate have been unsuccessful. Accordingly, evidence of prior terminations is relevant. Our review of the record indicates that little had changed from the time of the previous terminations to the current one. We find no error in the trial court's allowing the Judgment of a Prior Termination into evidence. Accordingly, this assignment of error is without merit.

## REASONABLE EXPECTATION OF SIGNIFICANT IMPROVEMENT

Louisiana Children's Code Article 1036(D)(3) states in part:

[L]ack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

. . . .

(3)Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

J.F. argues that the State failed to prove the lack of any reasonable expectation of significant improvement. J.F. claims that if he had been given additional time he would have been able to satisfy the requirements of the plan. However, nearly two years had elapsed since the birth of his daughter and the trial to terminate his rights. Because of the child's need for stability and a safe and permanent home, a parent does not have an unlimited time period within which to improve himself. During that time, J.F. failed to visit or provide support to his child and there was no indication that this situation was going to change due to J.F.'s dissatisfaction with the agency. He never sought the necessary counseling or

10

treatment for the conditions that led to removal in the first place.

J.F. argues that the trial court failed to address this prong of the two-part burden that must be met under La.Ch.Code art. 1015(5) as a grounds for termination. Although not addressed by the trial court, we find, based on the record before us, that the trial court would not have erred in finding that there was no reasonable expectation of significant improvement. Moreover, our review of the record indicates that the State met its burden of proving the grounds for termination under La.Ch.Code art. 1015(4)(b) & (c), without even addressing the requirements of La.Ch.Code art. 1015(5).

Moreover, we note that J.F. himself testified that he does not want custody of his child, rather he wants to be able to direct who will be allowed to adopt her. We find nothing in the record to suggest that a finding maintaining J.F.'s parental rights to S.N.F. would be in her best interests. This assignment of error is without merit.

## CONCLUSION

The judgment of the trial court terminating J.F.'s rights to his minor child, S.N.F., is affirmed. All costs of this appeal are assessed against J.F.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION, Uniform Rules—Courts of Appeal, Rule 2-16.3.

11